IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-01223-REB-MEH

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin corporation, as
Subrogee of Bison Ridge, LLC,
BISON RIDGE, LLC, a Colorado limited liability company

      Plaintiffs,

v.

ZURICH AMERICAN INSURANCE COMPANY, an Illinois corporation,
NORTHERN INSURANCE COMPANY OF NEW YORK, a New York corporation,
AMERICAN ZURICH INSURANCE COMPANY, an Illinois corporation,

      Defendants.

_____

## MOTION FOR SUMMARY JUDGMENT
_____

Plaintiffs American Family Mutual Insurance Company ("American Family") and

Bison Ridge, LLC ("Bison Ridge") (collectively "Plaintiffs") respectfully submit this Motion

for Summary Judgment pursuant to Fed. R. Civ. P. 56 and D.C.COLO.LCivR. 56.1.  In

support thereof, Plaintiffs state as follows:

## I.      INTRODUCTION

This is an insurance coverage case arising out of Defendants' refusal to defend

and indemnify Bison Ridge an additional insured under various policies of insurance

issued by Defendants, in four (4) separate state court construction defect lawsuits

("State Court Actions") filed against Bison Ridge.  American Family and Bison Ridge

move this Court for a judgment that the Defendants had a duty to defend the underlying

lawsuits and to provide indemnification.

Bison Ridge was the developer of Bison Ridge Subdivision ("the Project"), a project consisting of over one hundred lots for the construction of single family homes located in Windsor, Colorado.  Bison Ridge did not construct any of the homes in the Project; instead, it was only the developer of the raw land.  This development included installation of the utilities, grading the site into individual lots, and installing the streets and sidewalks.  After the conclusion of the development work, Bison Ridge then sold the lots to parties who ultimately built single family homes on the lots.

Bison Ridge contracted with Hall-Irwin Corporation ("Hall-Irwin") as the general contractor to perform the development work.  Hall-Irwin performed all of the grading of the lots, installed the utilities, and constructed the streets and sidewalks.  As part of the contract between Bison Ridge and Hall-Irwin, Hall-Irwin was required to name Bison Ridge as an additional insured on its insurance policies.  All of Hall-Irwin's policies contained blanket additional insured endorsements, qualifying Bison Ridge as an additional insured.

After the development work was complete, Bison Ridge was sued by the owners of three homes and one lot at the Project for alleged defects in the grading work performed by Hall-Irwin.  The general allegations in the four lawsuits were that the work of Hall-Irwin in grading and placing fill on the lots was improper and caused dirt on the lots to settle thereby causing resultant damage to the homes built on the lots.  As to the individual lot, the claimed damage was loss of use.

Bison Ridge tendered all four of the lawsuits to its insurance carrier American Family who agreed to defend three of the lawsuits under a reservation of rights.  Bison Ridge also tendered its defense to Defendants pursuant to its status as an additional

insured under Hall-Irwin's policies.   Defendants denied both defense and indemnity to Bison Ridge but did defend and indemnify Hall-Irwin.   American Family ultimately paid to extinguish the liability of Bison Ridge through settlement of the three cases it defended.

In this lawsuit, American Family seeks to recover the defense costs and the cost of the settlements it funded.   Bison Ridge also seeks to recover from Defendants the costs it spent to defend the one case American Family did not defend and to recover the amount it paid in settlement of that case.

## II.   MOVANTS' STATEMENT OF MATERIAL FACTS

1.     Bison Ridge, LLC was the developer of the Bison Ridge Subdivision, located in Windsor, Colorado.

2.     American Family issued the following policies of insurance to Bison Ridge relevant to this case:

> a.     Policy No. 05 XD5349-01 for the period April 15, 2003 to April 15, 2004 (***Exhibit  1***);
>
> b.     Policy No. 05 XD5349-02 for the period April 15, 2004 to April 15, 2005 (***Exhibit 2***); and,
>
> c.     Policy No. 05 XD5349-02 for the period April 15, 2005 to April 15, 2006 (***Exhibit 3***).

3.     Bison Ridge entered into an Independent Subcontractor Agreement ("Agreement") (***Exhibit 4***) with Hall-Irwin for work on the Project.   The Agreement is for the construction of the site development improvements including the grading of the lots. Paragraph 14 of the Agreement provides, in pertinent part, "Subcontractor authorizes

his or her insurance carrier to add Contractor as an additional insured to Subcontractor's General Liability Policy and Workman's Compensation Insurance Policy and to provide Contractor with a 30-day notice prior to its termination or expiration. *Id*.

4.    Defendant American Zurich Insurance Company ("AZIC") issued the following policies of insurance to Hall-Irwin:

a.    Policy No. CPO 3757761-00, effective January 1, 2003 to January 1, 2004 (***Exhibit 5***); and

b.    Policy No. CPO 3757761-01, effective December 31, 2003 to December 31, 2004 (***Exhibit 6***).

Both policies contain two additional insured endorsements:  (1) CG 20 33 10 01 provides coverage for Bison Ridge related to Hall-Irwin's ongoing operations performed for Bison Ridge (***Exhibit 5*** at Z 000341; ***Exhibit 6*** at Z 000463); and (2) CG 20 37 10 01 provides coverage for Bison Ridge related to Hall-Irwin's completed operations performed for Bison Ridge (***Exhibit 5*** at Z000342; ***Exhibit 6*** at Z 000464).

5.    Defendant Zurich American Insurance Company ("ZAIC") issued the following policies of insurance to Hall-Irwin:

a.    Policy No. CPO 3757761-02, effective December 31, 2004 to December 31, 2005 (***Exhibit 7***);

b.    Policy No. CPO 3757761-02, effective December 31, 2005 to December 31, 2006 (***Exhibit 8***);

c.    Policy No. CPO 3757761-03, effective December 31, 2006 to December 31, 2007 (***Exhibit 9***); and,

d.      Policy No. CPO 3757761, effective December 31, 2007 to

December 31, 2008 (*Exhibit 10*).

The 2005, 2006 and 2007 policies contain additional insured endorsement U-GL-1175-A CW, which provides primary, non-contributing completed operations coverage for Bison Ridge resulting from Hall-Irwin's work performed for Bison Ridge.  *Exhibit 7* at p. Z000567-568; *Exhibit 8* at p. Z 000706-707; and *Exhibit 9* at p. Z 000849-850.

The 2008 policy contains additional insured endorsement U-GL-1175-B CW, which provides primary, non-contributing completed operations coverage for Bison Ridge resulting from Hall-Irwin's work performed for Bison Ridge.  *Exhibit 10* at p. Z 001007-1008.  AZIC and ZAIC are collectively referred to herein as "Defendants" or "Zurich."

## A.      The Stickler Lawsuit

6.      On February 23, 2010 Patti Stickler ("Stickler") filed her lawsuit against Bison Ridge asserting a claim of negligence (*Exhibit 11*).  The Stickler Complaint alleged that fill was improperly placed on her lot by subcontractors to Bison Ridge and that these fills settled and moved laterally which in turn caused physical damage to the home (*Exhibit 11* at ¶¶ 5, 8, 9, 27- 35).

7.      Bison Ridge moved to dismiss the Stickler lawsuit based upon the statute of repose, which motion was granted by the state court.  American Family then paid $15,000 to settle the case in full and extinguish any right of appeal (*Exhibit 12*, Response # 2).  American Family also incurred $6,163.59 fees and $8,713.47 in costs to defend the Stickler lawsuit after the suit was tendered to Defendants.  *Id*. at Response # 1.

8.      Bison Ridge first tendered the Sticker lawsuit to Zurich for defense on May 13, 2010 (*Exhibit 13*).

9.      On September 7, 2012, AZIC and ZAIC agreed to defend Bison Ridge under a reservation or rights and to pay their pro rata share of Bison Ridge's reasonable and necessary defense fees and costs (*Exhibit 14*).   To date, Zurich has not paid any share of Bison Ridge's fees and costs.

**B.      The Hartman Lawsuit**

10.      On January 29, 2010 Bison Ridge was sent a notice of claim alleging property damage resulting from the grading and fill work performed by Hall-Irwin (*Exhibit 15*).   On February 10, 2010, Michael and Keriann Hartmans ("Hartmans") filed suit against Bison Ridge asserting, among other claims, a claim for negligence (*Exhibit 16*).   The Hartman Complaint alleged that fill was improperly placed on the lot by subcontractors to Bison Ridge and that these fills settled and moved laterally which in turn caused physical damage to the home (*Exhibit* 16 at ¶¶ 5, 8, 11- 13, 40- 50).

11.      American Family paid the amount stated in Ex. 17 to settle the Hartman lawsuit (*Exhibit 17*, Affidavit of Jerad West).[1]   American Family paid $118,959.50 in fees and $148,070.63 in costs to defend the Hartman lawsuit after tender to the Defendants (*Exhibit 12*, Response # 1).

12.      Bison Ridge first tendered the Hartman lawsuit to Zurich for defense on May 13, 2010 (*Exhibit 13*).

13.      On September 7, 2012, AZIC and ZAIC agreed to defend Bison Ridge under a reservation or rights and to pay their pro rata share of Bison Ridge's reasonable

---

[1] This document is being mailed to the Court.  The amount of the settlement is confidential and to keep the amount out of the public record the amount is not stated in this motion.  A request to file the exhibit under seal has been made as well as a request for the defendants to agree to a protective order.

and necessary defense fees and costs (*Exhibit 18*).  To date, Zurich has not paid any share of Bison Ridge's fees and costs.

**C.     The Lauro Lawsuit**

14.     On August 2, 2010, Robert and Yvonne Lauro (the "Lauros") filed suit against Bison Ridge asserting, among other claims, a claim for negligence (*Exhibit 19*). The Lauro Complaint alleged that fill was improperly placed on their lot by subcontractors to Bison Ridge and that these fills settled and moved laterally which in turn caused physical damage to the home (*Exhibit 19* at ¶¶ 5-6, 9, 27-35).

15.     American Family paid the amount stated in *Exhibit 17* to settle the Lauro lawsuit, and paid $50,789.50 in fees and $81,377 in costs to defend the Lauro lawsuit after tender to Defendants (*Exhibit 12*, Response # 1).

16.     Bison Ridge first tendered the Lauro lawsuit to Zurich for defense on May 2, 2011 (*Exhibit 20*).

17.     On September 7, 2012, AZIC and ZAIC agreed to defend Bison Ridge under a reservation or rights and to pay their pro rata share of Bison Ridge's reasonable and necessary defense fees and costs (*Exhibit 21*).  To date, Zurich has not paid any share of Bison Ridge's fees and costs.

**D.     The McWilliams Lawsuit**

18.     On March 18, 2011, Charlene McWilliams ("McWilliams") filed suit against Bison Ridge (*Exhibit 22*).  The McWilliams' Complaint alleged that fill placed on their lot by Hall-Irwin for Bison Ridge was unstable (*Exhibit 22* at ¶¶ 3-4).

19.   Bison Ridge paid $40,000 to settle the McWilliams lawsuit (***Exhibit 23***, Response # 2).  Bison Ridge paid $9,873.50 in fees and $971.32 in costs to defend the McWilliams lawsuit after tender to Defendants.  ***Id***. at Response # 1.

20.   Bison Ridge first tendered the McWilliams lawsuit tendered to Zurich for defense on May 2, 2011 (***Exhibit 20***).

### III.   LEGAL STANDARDS

#### a.  Standard of Review

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-3 (1986), *citing* Fed. R. Civ. P. 56(c).  If the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists, then the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

#### b.  Standards Governing Interpretation of Policy Language

Because this Court's subject matter jurisdiction is based on diversity of citizenship of the parties, the Court applies Colorado's substantive law governing the interpretation of insurance policy language.  *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426-27, 116 S.Ct. 2211, 2219 (1996).  Under Colorado law, insurance policies are construed under the same traditional principles that govern the interpretation of any contract. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999).  Thus, courts must enforce the plain language of the policy unless it is ambiguous.  *Hoang v. Assurance Co.*

*of Am.*, 149 P.3d 798, 801 (Colo. 2007).  The Court reads the contract as a whole and does not read its provisions in isolation.  *Id.*  The Court also liberally construes an insurance contract to provide for the broadest possible coverage.  *See Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1300 (Colo. App. 1998).

Policy exclusions should be strictly construed against the insurer, particularly where they are of uncertain import or reasonably susceptible to more than one construction, or where they negate coverage provided elsewhere in the policy.  *Martinez v. Hawkeye-Sec. Ins. Co.*, 576 P.2d 1017 (Colo. 1978); *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236 (Colo. 1992).  A risk that falls naturally within one or more coverage provisions of the policy should not be treated as excluded by another provision of the policy unless such intent is clear from the words of the policy.  *See* 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 22:31 at 22-66 to 22-67 (3d ed. 1997) (hereinafter "*Couch on Ins.*").  A policy should be considered as a whole to give reasonable meaning to every provision.  In this way, the reasonable expectations of the insured as to coverage can be ascertained and respected.

### c.  Standards Governing the Duty to Defend

Whether an insurer has a duty to defend is determined by examination of solely the policy and the allegations found within the four corners of the complaint.  *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1145 (10th Cir. 2008); *see also Dish Network Corp. v. Arch Specialty Ins.*, 659 F.3d 110, 1021-25 (10th Cir. 2011).  In *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951 (10th Cir. 2011), the Tenth Circuit recently reaffirmed this principle and applied the Colorado Supreme Court's long standing rule of law that "an insurer's duty to defend arises *solely* from the complaint in

the underlying action." *Id.* at 960, citing *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 827 (Colo. 2004).  There are two narrow exception to the so called, Complaint Rule, neither of which apply here[2]

The duty to defend is broader than the duty to indemnify, and "because of the unique nature of insurance contracts and the relationship between the insurer and insured, [courts] construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." *Greystone v. Natl'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1284 (10th Cir. 2011), citing *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003); *see also Dish Network*, 659 F.3d at 1021-25.   Under Colorado law:

> [a]n insurer seeking to avoid its duty to defend an insured bears a heavy burden.  **An insurer's duty to defend arises when the underlying complaint against the insured alleges any facts that might fall within the coverage of the policy**. . . . Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, **the insurer must accept the defense of the claim**.

*Greystone v. Natl'l Fire & Marine Ins. Co.*, 661 F.3d at 1284 (emphasis added), citing *Compass Ins. Co. v. City of Littleton*, *supra.* at 613-14.  If coverage potentially exists for only *part* of the claim or lawsuit, the insurance company must provide the insured with a

---

[2] The two exceptions are found in *Pompa,* 520 F.3d 1139 and *AIMCO v. Nutmeg Ins. Co.*, 593 F.3d 1188 (10th Cir. 2010).  The narrow exception recognized in *Pompa* was "an indisputable fact that [was] not an element of either the cause of action or a defense in the underlying litigation," i.e., a criminal conviction in another proceeding.  Because the court could have taken judicial notice of the criminal conviction, the Tenth Circuit held "that fact can be said to appear within the four corners of the complaint."  *Pompa*, 520 F.3d at 1149.

In *AIMCO*, the Tenth Circuit recognized a second exception considering extrinsic evidence in the form of an "allegation contained in several separate but factually related complaints."  *AIMCO*, 593 F.3d at 1190. However, that extrinsic evidence was still required to be within the allegations of a complaint, albeit a separate complaint from the one at issue.

defense for the *entire* action.  *Blackhawk-Central Sanitation Dist. v. Am. Guar. & Liab. Ins. Co.*, 214 F.3d 1183, 1189 (10th Cir. 2000).

### d.  Standards Governing the Duty to Indemnify

In contrast to the duty to defend, an insurer's duty to indemnify arises only if the insured's conduct and the resulting loss or damage *actually* fall within the CGL insurance policy's coverage.  The duty to indemnify only becomes ripe for consideration by the court after the insured actually has incurred liability for the underlying claims (i.e., after judgment has been entered or a settlement has been finalized in the underlying action).  *Compass Ins. Co*, 984 P.2d at 621.  "In determining the possibility of indemnity coverage, the trial court must examine the nature of the facts alleged and claims pled in the complaint or amended complaint liberally with a view toward affording the greatest possible protection to the insured.  If, when read liberally, such document can colorably support a conclusion that coverage may attach, then the court may consider such additional evidence as will buttress or defeat coverage."  *Cyprus*, 74 P.3d at 297.

When determining a duty to indemnify the Complaint is the starting point, but it is not an end point.  *Id*. At 298.  A determination of a duty to indemnify is based upon the full factual record.  *Employers' Fire Ins. Co. v. W. Guar. Fund Services*, 924 P.2d 1107, 1110 (Colo. App. 1996).  Indemnity flows from the nature of the ultimate verdict, judgment, or settlement.  *Id.*

### IV.  ARGUMENT

### A.  Bison Ridge, LLC is an insured under the Defendants' policies

### a.  American Zurich Insurance Company

AZIC issued two policies to Hall-Irwin which provide coverage to Bison Ridge as an additional insured (*see* **Exhibits 5** and **6**).  Policy CPO 3757761-00 was effective from January 1, 2003 to January 1, 2004, policy No. CPO 3757761-0 was effective December 31, 2003 to December 31, 2004.  *Id*.

The policies contain two separate blanket additional insured endorsements.  The first one, CG 20 33 10 01, states that any entity who hires Hall-Irwin and in writing requires Hall-Irwin to add it is an additional insured on Hall-Irwin's policy for ongoing operations (**Exhibit 5** at p. Z 000341; **Exhibit 6** at p. Z 00463):

## CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II — Who Is An Insured** is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. A person-s or organization-s status as an insured under this endorsement ends when your operations for that insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

**2. Exclusions**

This insurance does not apply to:

**a.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**(1)** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**(2)** Supervisory, inspection, architectural or engineering activities.

**b.** "Bodily injury" or "property damage" occurring after:

**(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

12

The second endorsement, CG 20 37 10 01, provides that any entity who hires Hall-Irwin and requires Hall-Irwin to add it as an additional insured via contract is an additional insured for liability arising out of Hall-Irwin's completed operations (***Exhibit 5*** at p. Z 000342; ***Exhibit 6*** at p. Z 000464):

POLICY NUMBER: CPO 3757761-01

COMMERCIAL GENERAL LIABILITY
CG 20 37 10 01

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name of Person or Organization:**<br>BLANKET AS REQUIRED BY WRITTEN CONTRACT |
| **Location And Description of Completed Operations:**<br>AS REQUIRED BY WRITTEN CONTRACT |
| **Additional Premium:**<br>INCL. |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

The term "arising out of" as used in an insurance policy has been construed under Colorado law to mean only that the injury must "originate from, grow out of, or flow from" the specified act or circumstance. *State Farm Mut. Auto Ins. Co. v. Kastner*, 77 P. 3d 1256, 1264 (Colo. 2003).

The only prerequisite to being an additional insured under these two endorsements is either a written obligation to name Bison Ridge as an additional insured under CG 20 33 10 0, or a contractual obligation to name Bison Ridge as an additional insured CG 20 37 10 01.   Bison Ridge required Hall-Irwin to add it as an additional insured under Hall-Irwin's insurance policies.   Paragraph 14 of the written agreement between Bison Ridge and Hall-Irwin provides, "Subcontractor authorizes his or her insurance carrier to add Contractor as an additional insured to Subcontractor's General Liability Policy… (*Exhibit 4* at ¶ 14). Therefore, Bison Ridge qualifies as an additional insured under AZIC's two policies.

### b.    Zurich American Insurance Company

ZAIC issued four policies to Hall-Irwin which provide coverage to Bison Ridge as an additional insured: Policy No. CPO 3757761-02, effective December 31, 2004 to December 31, 2005; policy No. CPO 3757761-02, effective December 31, 2005 to December 31, 2006; policy No. CPO 3757761-03, effective December 31, 2006 to December 31, 2007; policy No. CPO 3757761, effective December 31, 2007 to December 31, 2008 (*Exhibits 7*, *8*, *9*, and *10*, respectively).

The December 2004 – December 2007 policies contain Additional Insured Endorsement U-GL-1175-A CW.  The December 2007-2008 policy contains Additional Insured Endorsement U-GL-1175-B CW.  Both endorsements state than any entity that, pursuant to written contract or agreement, requires Hall-Irwin to add it is an additional insured, is thereby added as an additional insured on Hall-Irwin's policy.   Both endorsements provide coverage for both on-going and completed operations:

## Additional Insured – Automatic - Owners, Lessees Or Contractors - Broad Form

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Producer | Add'L Prem | Return Prem. |
|---|---|---|---|---|---|---|
| | | | | | $ | $ |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Commercial General Liability Coverage Part**

A.  **WHO IS AN INSURED (Section II)** is amended to include as an insured any person or organization whom you are required to add as an additional insured on this policy under a written contract or written agreement.

B.  The insurance provided to additional insureds applies only to "bodily injury", "property damage" or "personal and advertising injury" covered under **Section I, Coverage A, BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **Coverage B,  PERSONAL AND ADVERTISING INJURY LIABILITY**, but only if:

  1.  The "bodily injury" or  "property damage" results from your negligence; and

  2.  The "bodily injury",  "property damage"  or "personal and advertising injury" results directly from:

      a.  Your ongoing operations; or

      b.  "Your work" completed as included in the "products-completed operations hazard",

      performed for the additional insured, which is the subject of the written contract or written agreement.

**Exhibit 7** at p. Z000567-68; **Exhibit 8** at p. 000706-07; **Exhibit 9** at p. Z 000850-51.

## Additional Insured – Automatic – Owners, Lessees Or Contractors



| Policy No. | Exp. Date of Pol. | Eff. Date of End. | Agency No. | Addl. Prem. | Return Prem. |
|---|---|---|---|---|---|
| | | | | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Named Insured:**
**Address (including ZIP Code):**

This endorsement modifies insurance provided under the:
**Commercial General Liability Coverage Part**

A.  **Section II – Who Is An Insured** is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.

B.  The insurance provided to the additional insured person or organization applies only to "bodily injury", "property damage" or "personal and advertising injury" covered under **SECTION I - Coverage A - Bodily Injury And Property Damage Liability** and **Section I - Coverage B - Personal And Advertising Injury Liability**, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

  1.  Your acts or omissions; or

  2.  The acts or omissions of those acting on your behalf; and resulting directly from:

      a.  Your ongoing operations performed for the additional insured, which is the subject of the written contract or written agreement; or

      b.  "Your work" completed as included in the "products-completed operations hazard", performed for the additional insured, which is the subject of the written contract or written agreement.

***Exhibit 10*** at p. Z 001007.

The only prerequisite to being an additional insured under these two endorsements is a contractual obligation to name Bison Ridge as an additional insured. Bison Ridge required Hall-Irwin to add it as an additional insured under Hall-Irwin's insurance policies (***Exhibit 4*** ¶ 14).   Therefore, Bison Ridge qualifies as an additional insured under AZIC's four policies.

### B.  Duty to Defend

As shown above, Bison Ridge is an insured under the Defendants' policies.   The Defendants' policies promise to pay all sums the insured (Bison Ridge) becomes "legally obligated to pay" because of "property damage" caused by an "occurrence," unless coverage for the claim is excluded by other provisions in the policy (***Exhibit 5*** p. Z 000322 (03); ***Exhibit 6*** Z 000446 (04); ***Exhibit 7*** Z000574 (05); ***Exhibit 8*** Z 000717 (06); ***Exhibit 9*** p. Z 000861 (07); ***Exhibit 10*** p. Z 001020 (08)).   The Defendants' policies also impose a duty on them to "defend the insured against any 'suit' seeking those damages."   ***Id.*** "Occurrence" is defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" (***Exhibit 5*** p. Z 000335 (03); ***Exhibit 6*** Z 000459 (04); ***Exhibit 7*** Z000587 (05); ***Exhibit 8*** Z 000730 (06); ***Exhibit 9*** p. Z 000874 (07); ***Exhibit 10*** p. Z 001033 (08)).

As held by the Colorado Supreme Court in *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, *supra.* at 301:

> In the duty to defend context, the "complaint rule" operates to cast a broad net, such that when the underlying complaint alleges ***any facts*** or claims that might fall within the ambit of the policy, the insurer must tender a defense.   (citations omitted).   An insurer has a heavy burden to overcome in avoiding the duty to defend, such that **"the insured need only show**

> **that the underlying claim _may_ fall within policy coverage; the insurer must prove it cannot.”**

(Emphasis added.)

Even when the allegations in the Complaint are questionable as to whether there is coverage under the policy and the facts therefore only arguably, or potentially, trigger coverage, the insurer must provide a defense.  *Greystone*, 661 F.3d at 1284.  To avoid the duty to defend, a liability insurer must establish that the factual allegations in the underlying complaint reveal a situation that is **solely and entirely** within the policy's exclusions.  *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 37 (Colo. App. 2007).  Therefore, so long as the complaints in the underlying lawsuit allege **any facts** that **may** constitute an "occurrence" causing "property damage" occurring within the policy period, the Defendants owed a duty to defend.  The 10th Circuit recently held that injuries flowing from improper or faulty workmanship constitute an "occurrence" so long as the resulting property damage is not to the work of the insured or is to the insured's non-defective work.  *Greystone*, 661 F.3d at 1267-68.

As shown below, in each case there were allegations of property damage resulting from Hall-Irwin's defective work for Bison Ridge, LLC.  In each case the Defendants owed a duty to defend.

### a.   Stickler Lawsuit

The Stickler Complaint alleged:

1. Construction on the home was completed in November of 2004 (**Exhibit 11** at ¶ 4).

2. The home was sold to Stickler in March of 2007.  **Id**.

3. On or about December of 2007, Stickler discovered drywall cracks in the interior of her home, followed by the discovery of cracks in the basement floor slab and

movement in the foundation…The drywall cracks and cracks in the basement have progressively worsened.  None of the cracks were apparent at the time Stickler purchased the home.  *Id*. at 5.

4.  The moisture and densities of the slope fill (as presented by the SCA data) are significantly below the acceptable range for structural support.  It is our opinion that settlement of this fill has resulted in increased settlement and lateral movement of fill beneath the residence on the west side.  *Id*. at ¶ 8.

5.  Defendants Hartford Homes, Inc. (Hartford Homes) and Bison Ridge, LLC (Bison Ridge) were developers of the subdivision where Stickler's home is located, Bison Ridge subdivision.  Bison Ridge sold the lot on which the Stickler home was constructed.   Hartford Homes and/or Bison Ridge engaged subcontractors for work on the subdivision, which included importing fill, compaction, grading and overlot grading, and construction of infrastructure such as curbs, gutters, and streets.  *Id*. at ¶ 9.

6.  Bison Ridge imported a substantial amount of fill to enlarge and build up lots which are now situated on Arroyo Drive, including Stickler's lot.  *Id*. at ¶ 28.

7.  Bison Ridge, as the developers of Bison Ridge Subdivision were required to perform or have performed the compaction, grading and overlot grading for each of the lots…including Stickler's lot.  *Id*. at ¶ 29.

8.  The imported fill was not "structural" fill.  Moreover, the amount of fill placed on Sticker's lot was excessive and inconsistent with good building practices.  As a result, Stickler's home is and has been settling and moving laterally down the slope to the west causing significant damages.  *Id*. at 30.

9.  The imported fill was not properly compacted, and, as a result, Stickler's home is and has been settling and moving laterally down the slope to the west, causing significant damages.  *Id*. at 31.

10. Bison Ridge's failure to import structural fill and the placement of excessive amounts of fill breached their duty to Sticker and proximately caused damages to Stickler's home.  *Id*. at ¶ 32.

11. The compaction, overlot grading, and other engineering work Hartford Homes and/or Bison Ridge had performed was inadequate, insufficient, and substandard, and proximately caused damages to Stickler's home.  *Id*. at ¶ 34.

**b.   Hartman Lawsuit**

The Hartman Complaint alleged:

1.  Construction on the Hartman home started in April of 2004 (***Exhibit 16*** at ¶ 3).

2. On or about January of 2008, when they returned from Christmas vacation, the Hartmans discovered significant drywall cracks in the interior of their home…. Afterwards, other problems with their home began to appear such as inoperable windows and doors, which suggested foundation movement.  Subsequently, additional foundation movement became apparent as cracks in the basement slab, foundation walls, and other flatwork appeared, cracks in the drywall surfaced throughout the Hartmans' home, a stairway from the walk-out patio to the deck separated from the home, and numerous other problems with the construction of the home were detected, including a difference of approximately one and one-half inch in the level of the first floor of the Hartmans' home as measured against the southwest corner of the first floor.  *Id* at ¶ 4.

3. Defendants Hartford Homes, Inc. (Hartford Homes) and Bison Ridge, LLC (Bison Ridge) were developers of the subdivision where the Hartmans' home is located, Bison Ridge subdivision.  Bison Ridge sold the Hartmans the lot upon which the Hartmans' home was constructed.  Hartford Homes and/or Bison Ridge engaged subcontractors, including Terracon, for work on the subdivision, which included importing fill, compaction grading and overlot grading and construction of infrastructure such as curbs, gutters and streets.  Terracon was engaged by Bison Ridge to perform overlot grading and, upon information and belief, other engineering work.  *Id*. at ¶ 8.

4. The moisture and densities of the slope fill (as presented by the SCA data) are significantly below the acceptable range for structural support.  It is our opinion that settlement of this fill has resulted in increased settlement and lateral movement of fill beneath the residence on the west side.  *Id*. at ¶ 8.

5. Defendants Hartford Homes, Inc. (Hartford Homes) and Bison Ridge, LLC (Bison Ridge) were developers of the subdivision where Stickler's home is located, Bison Ridge subdivision.  Bison Ridge sold the lot on which the Stickler home was constructed.   Hartford Homes and/or Bison Ridge engaged subcontractors for work on the subdivision, which included importing fill, compaction, grading and overlot grading, and construction of infrastructure such as curbs, gutters, and streets.  *Id*. at ¶ 9.

6. Bison Ridge imported a substantial amount of fill to enlarge and build up lots which are now situated on Arroyo Drive, including the Hartmans' lot.  *Id*. at ¶ 41.

7. Bison Ridge, as the developers of Bison Ridge Subdivision were required to perform or have performed the compaction, grading and overlot grading for each of the lots…including Hartmans' lot.  *Id*. at ¶ 42.

8. The imported fill was not "structural" fill.  Moreover, the amount of fill placed on the Hartmans' lot was excessive and inconsistent with good building practices.

As a result, Hartmans' home is and has been settling and moving laterally down the slope to the west causing significant damages. *Id*. at 44.

9. The imported fill was not properly compacted, and, as a result, the Hartmans' home is and has been settling and moving laterally down the slope to the west, causing significant damages. *Id*. at 45.

10. ….Bison Ridge's failure to import structural fill and the placement of excessive amounts of fill breached their duty to the Hartmans and proximately caused damages to the Hartmans' home. *Id*. at ¶ 46.

11. Hartford Homes and/or Bison Ridge had a duty to the Hartmans to perform compaction, overlot grading, and other engineering work in a manner that, under the circumstances, would avoid movement of the foundation and damages to the Hartmans' home. *Id*. at ¶ 48.

### c.   Lauro Lawsuit

The Lauro Complaint alleged:

1. Construction of the Lauro home was complete on or about March of 2006 (***Exhibit 19*** at ¶ 3).

2. On or about January of 2009, the Lauros noticed a crack on the drywall on the west wall of their basement….Repairs were made to the drywall, and the problem was deemed to be cosmetic….Following the repairs, the Lauros believe that the problem was resolved. *Id.* at ¶ 5.   On or about May of 2009, the crack in the drywall reappeared and additional signs of structural distress began to surface.  By December 2009, it became apparent that the Lauros' home was experiencing movement, which was believed to be settlement. *Id.* at ¶ 6.

3. Defendant Bison Ridge, LLC (Bison Ridge) was the developer of the subdivision where the Lauros' home is located, Bison Ridge subdivision.  Bison Ridge sold the lot upon which the Lauros' home was constructed.  Bison Ridge engaged subcontractors for work on the subdivision, which included importing fill, compaction, grading, and overlot grading and construction of infrastructure such as curbs, gutters and streets. *Id.* at ¶ 9.

4. The moisture and densities of the slope fill (as presented by the SCA data) are significantly below the acceptable range for structural support.  It is our opinion that settlement of this fill has resulted in increased settlement and lateral movement of fill beneath the residence on the west side. *Id* at ¶ 8.

5. Defendants Hartford Homes, Inc. (Hartford Homes) and Bison Ridge, LLC (Bison Ridge) were developers of the subdivision where the Lauros' home is

located, Bison Ridge subdivision.  Bison Ridge sold the lot on which the Lauros' home was constructed.    Hartford Homes and/or Bison Ridge engaged subcontractors for work on the subdivision, which included importing fill, compaction, grading and overlot grading, and construction of infrastructure such as curbs, gutters, and streets.  *Id* at ¶ 9.

6. ….Bison Ridge imported a substantial amount of fill to enlarge and build up lots which are now situated on Arroyo Drive and Leana Court, including the Lauro's lot.  *Id*. at ¶ 28.

7. Bison Ridge, as the developer of Bison Ridge Subdivision, was required to perform or have performed the compaction, grading and overlot grading for each of the lots…including the Lauros' lot.  *Id*. at ¶ 29.

8. The imported fill was not "structural" fill.  Moreover, the amount of fill placed on the Lauros' lot was excessive and inconsistent with good building practices.  As a result, the Lauros' home is and has been settling and moving laterally down the slope to the west causing significant damages.  *Id*. at 30.

9. The imported fill was not properly compacted, and, as a result, the Lauros' home is and has been settling and moving laterally down the slope to the west, causing significant damages.  *Id*. at 31.

10. Bison Ridge's failure to import structural fill and the placement of excessive amounts of fill breached their duty to the Lauros and proximately caused damages to the Lauros' home.  *Id*. at ¶ 32.

11. Bison Ridge had a duty to the Lauros to import structural fill and the proper amount of fill, and to ensure that compaction and overlot grading work was performed in a manner that, under the circumstances, would avoid movement of the foundation and damages to the Lauros' home.  *Id*. at ¶ 34.

### d.   McWilliams Lawsuit

The McWilliams Complaint alleged:

1. Defendant Bison Ridge, LLC (Bison Ridge) is a real estate developer that developed and offered for sale residential lots in Bison Ridge Subdivision, which is located in Windsor Colorado (***Exhibit 22*** at ¶ 3).

2. The McWilliams and Bison Ridge entered into a Contract to Buy and Sell Real Estate dated May 22, 2004.  Pursuant to the Contract, Bison Ridge was to sell the McWilliams a lot that was "permit ready."   The McWilliams intended to build a custom home on the lot, and were assured by Bison Ridge and/or its agents and representatives that the lot was suitable for building.  *Id*. at ¶ 4.

3. The McWilliams later built their home elsewhere, and elected to sell the lot. *Id.* at ¶ 6.

4. On or about June of 2010, the McWilliams discovered that the homes built on adjacent lots were experiencing distress associated with settlement and other foundation movement. It was further discovered that the soils on the McWilliams lot and the adjacent lots were instable. As a result, the McWilliams' were advised that their lot was not suitable for building and, accordingly, was not saleable. *Id.* at ¶ 7.

### e. Defendants' owe a duty to defend each suit

Each Complaint alleges an "occurrence": the improper placement of fill on the lot which was done by Hall-Irwin pursuant to its contract with Bison Ridge. The Complaints all allege property damage as a result of the occurrence to work other than the work of Hall-Irwin (damage to the homes themselves for Stickler, Hartman, and Lauro). As to McWilliams, where no home was built, the Complaint alleges loss of use. The Defendants' policies define "Property Damage" to include loss of use of tangible property that is not physically injured. See Section C below. The nature of the damage alleged (settlement, movement and consolidation of fill) is continuous in nature from the date the fill was placed in 2003 through the date of filing suit. Therefore it is unquestioned each of the Complaints triggered a duty to defend under each of the Defendants' policies.

### C.      Duty to Indemnify

Pursuant to the terms of the Policies, the Defendants must pay all sums the insured (Bison Ridge) becomes "legally obligated to pay" because of "property damage" caused by an "occurrence," unless coverage for the claim is excluded by other provisions in the policy (***Exhibit 5*** p. Z 000322 (03); ***Exhibit 6*** Z 000446 (04); ***Exhibit 7*** Z000574 (05); ***Exhibit 8*** Z 000717 (06); ***Exhibit 9*** p. Z 000861 (07); ***Exhibit 10*** p. Z 001020 (08)). The burden of

establishing the applicability of an exclusion falls on the insurer.  *Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991).

In each policy "property damage" is defined as follows:

"Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Exhibit 5* p. Z 000336 (03); *Exhibit 6* Z 000460 (04); *Exhibit 7* Z000588 (05); *Exhibit 8* Z 000730-31 (06); *Exhibit 9* p. Z 000874-75 (07); *Exhibit 10* p. Z 001033-34 (08)). Defective construction constitutes an "occurrence" so long as the damage was not intended and the property damage is not to the work of the insured or is to the insured's non-defective work.  *Greystone*, 661 F.3d at 1267-68.  Thus, all that needs to be shown is that as a result of an "occurrence" (Hall-Irwin's defective construction) a piece of tangible property other than Hall-Irwin's work (the Stickler, Hartman, and Lauro Homes) was physically injured or that a piece of tangible property not physically injured (the McWilliams' lot) suffered a loss of use.

The additional insured endorsements also have their own requirements to meet before indemnity is owed.  In the 2003 and 2004 calendar year policies issued by AZIC for indemnity to be owed the property damage or loss of use need only "arise out of" Hall-Irwin's work (*Exhibit 5* at p. Z 000342; *Exhibit 6* at p. Z 000464).  In the 2005-2007 policies issued by ZAIC require that the "property damage" result from Hall-Irwin's negligence and also result from the work performed by Hall-Irwin pursuant to its contract

with Bison Ridge (*Exhibit 7* at p. Z000567-68; *Exhibit 8* at p. 000706-07; *Exhibit 9* at p. Z 000850-51).

The additional insured endorsement in the 2008 policy issued by ZAIC does not require the "property damage" to result from Hall-Irwin's negligence, instead it only requires that any liability for "property damage" be caused "in whole or in part by" Hall-Irwin's "acts or omissions" (*Exhibit 10* at Z 001007).  Here, Bison Ridge incurred liability in the form of a settlement of each case.  Each settlement was to extinguish liability for property damage caused by the work of Hall-Irwin in placing the soil on each lot; therefore, as shown below, at a minimum the 2008 policy provides indemnity coverage for each of the four settlements.

### a.  The Stickler Lawsuit

Bison Ridge prevailed on a Motion to Dismiss under the statute of limitations and was dismissed from the Stickler lawsuit (*Exhibit 12*, Response # 13).   The plaintiff appealed and American Family paid $15,000 to settle the case while the appeal was pending (*Id.* at # 2).

Plaintiff's experts in the Stickler case opined that the reason the home was being damaged was due to the settlement and instability of the fill soils placed by Hall-Irwin (*Exhibit 24*).  Mr. Larsen's report states:  "It is my opinion that your home is experiencing differential settlement and most likely slope stability problems" (*id.* at p. 4).   The report further states, "I also do not believe that this fill was placed with a level of care adequate for this structure.  This is causing a differential settlement that is being expressed through cracking mostly on the west side of the home."   *Id*.  Finally, the report states, "Based on

my observations, my analysis of the reports, and my knowledge of adjacent properties, I believe it is logical to assume the house is sliding down the slope."

### b. The Hartman Lawsuit

Bison Ridge settled the Hartmans' claims against it before trial for amount indicated in **Exhibit 17** which was paid by American Family.  Defendants did not fund any part of this settlement.

The Hartmans' experts opined that the fill placed by Hall-Irwin was improperly placed and a cause of the distress to the home.  The experts opined:  "SCA and the developer fell below the standard of care by allowing placement of poorly compacted fill without adequate moisture control resulting in exacerbation of fill settlement on the Hartman lot" (**Exhibit 25**, p. 2).  "The presence of organics in the alluvial material indicates that the site was not prepared properly prior to placement of fill.  Furthermore, the lack of site preparation indicates that proper benching of the native soil as required by Terracon (2000) might not have been completed. The presence of organics in the native soils below the fill may result in a weak soil layer, which can result in potentially unstable slope condition.  SCA and the developer fell below the standard of care by not properly preparing the site prior to fill placement" (**id.** at 4).

Bison Ridge's experts opined that the fill placed by Hall-Irwin was not properly compacted and this was a cause of damage to the home.  "While some variability in fill can be anticipated, it appears likely the clay fill is under-compacted beneath portions of the lot.  In our opinion, this under-compaction led to a more compressible fill with self-weight settlement likely to exceed the 1 percent value indicated in Section 8.2.  For 20 feet of till this could result in 1 to 3 inches of settlement.  Based on the borings, this settlement could

vary significantly over short distances causing angular distortion to the residence.  This is manly a construction-related issue, but construction oversight may be a component" (**Exhibit 26**, p. 21). "In our opinion,….the placement of under-compacted fills beneath the lot,….resulted in the distress manifested today" (*id*. at p. 17) (items omitted include other potential causes).

### c.  The Lauro Lawsuit

American Family paid the amount stated in **Exhibit 17** to settle the Lauro Lawsuit. The Defendants did not contribute any amount towards this settlement on behalf of Bison Ridge.[3]

The Plaintiffs' experts opined that fill under the home had settled causing the home to crack (**Exhibit 27**, p. 6).   He found some of placed did not meet the project specifications.  *Id*. at p. 8.  He opined that fill placed not to project specifications was below the standard of care and a cause of distress to the home.  *Id*. at p. 10.  He also found some of the native soils on site were prone to collapse and therefore should have been identified and removed by Hall-Irwin during its overlot grading work (**Exhibit 28**, p. 3-4).

### d.  The McWilliams Lawsuit

Bison Ridge paid $40,000 to settle the McWilliams' suit and no insurer contributed to the settlement (**Exhibit 23**, Response # 2).

The McWilliams' experts opined that due to the known issues with the fill placed on the lots adjacent to the McWilliams' lot (the McWilliams lot is between the Hartman and the Lauro Lots) it was necessary to remove and replace the fill on the lot before a home could be constructed (**Exhibit 29,** p. 1-2).

---

[3] Defendants did provide settlement funds to extinguish Hall-Irwin's liability to Bison Ridge's third party claims, but made this payment to extinguish the liability of their insured Hall-Irwin, not Bison Ridge.

### e.  The Defendants owe a duty to indemnify for each settlement

Each of the cases above settled before trial.  A determination of a duty to indemnify is based upon the full factual record and the obligation to indemnify flows from the nature of the ultimate verdict, judgment, or settlement.  *Employers' Fire*, 924 P.2d at 1110.  Each case was settled to extinguish Bison Ridge's exposure to liability due to Hall-Irwin's placement of fill at the project.

As shown above in the Stickler, Hartman, and Lauro cases, the experts opined that the reason the homes were being damaged was due to the settlement and instability of the fill soils placed by Hall-Irwin.  They also opined that Bison Ridge (the developer) fell below the standard of care because its contractor (Hall-Irwin) improperly placed fill.  The improper placement of the fill by Hall-Irwin constitutes an occurrence.  The homes and lots are tangible properties that were physically damaged as a result of the occurrence.  The damage was continuous and progressive from the time the fill was placed through the date of filing suit which varied from 2009 to 2010.  As a result, each of the Defendants' policy periods is triggered.

Additional insured endorsement CG 20 37 10 01 found in the American Zurich policies in effect from January 1, 2003 to December 31, 2004 provides coverage because the claimed damages, at least in part, arise out of Hall-Irwin's placement of fill on the lots (***Exhibit 5*** at Z 000341-342; ***Exhibit 6*** at Z 000463-464).  As shown above, this is undisputed.  ZAIC's additional insured endorsement U-GL-1175-A CW in effect from December 2004 – December 2007 also provides coverage because there was property damage resulting from Hall-Irwin's negligence following Hall-Irwin's completed

operations performed for Bison Ridge (***Exhibit 7*** at p. Z000567-568; ***Exhibit 8*** at p. Z 000706-707; ***Exhibit 9*** at p. Z 000849-850).  As shown above, this is also undisputed.

Lastly, ZAIC's additional insured endorsement U-GL-1175 B CW in effect from December 2007 to December 2008 clearly provides coverage (***Exhibit 10*** at p. Z 001007-1008).  For coverage to attach under this endorsement all that is required is that the property damage be caused, in whole or in part, by Hall-Irwin's acts or omissions. ***Id.*** at Z 001007 ¶ B(1).  As shown above for the Stickler, Hartman, and Lauro homes, the cracking and settling of each home was caused, at least in part, by the settling of the fill placed by Hall-Irwin.  As to the McWilliams' home, the "property damage" that occurred under the policy was a loss of use.  This loss of use was caused by the fill placed by Hall-Irwin.

### D. The Defendants are Responsible for all Defense and Indemnity Payments Made

In every policy year that is triggered, American Family's and the Defendants' policies overlap as shown by this table:

| Insurer | Policy Period | Limits |
| --- | --- | --- |
| AZIC | 1/01/2003 to 1/01/2004 | $1,000,000 each occurrence |
| American Family | 4/15/2003 to 04/15/2004 | $1,000,000 each occurrence |
| AZIC | 12/31/2003 to 12/31/2004 | $1,000,000 each occurrence |
| American Family | 4/15/2004 to 4/15/2005 | $1,000,000 each occurrence |
| ZAIC | 12/31/2004 to 12/31/2005 | $1,000,000 each occurrence |
| American Family | 04/15/2005 to 04/15/2006 | $1,000,000 each occurrence |
| ZAIC | 12/31/2005 to 12/31/2006 | $1,000,000 each occurrence |
| ZAIC | 12/31/2006 to 12/31/2007 | $1,000,000 each occurrence |
| ZAIC | 12/31/2007 to 12/31/2008 | $1,000,000 each occurrence |

Pursuant to the express terms of these policies, Defendants' policies provide primary coverage in each of these years and American Family's policies provide excess

coverage.  Because they are excess, American Family's policies do not provide a duty to defend.  As explained below, because the losses in any one year never reach the $1,000,000 limit on any of the Defendants' policies, American Family's policies are not triggered.  Because American Family's policies are not triggered, Defendants and Defendants alone are responsible for all of the defense fees and costs incurred and all of the indemnity payments made.  Defendants must reimburse American Family for the full amount of these payments.

Hall-Irwin completed its grading work at Bison Ridge no later than October 14, 2003 (**Exhibit 30** at p. 2).  Because the at-issue property damage was gradual, long term, and indivisible of being determined to have occurred in any specific year, the settlement payments should be equally allocated between all six relevant policy periods. *Pub. Serv. Co. v. Wallis & Co.*, 986 P.2d 924, 940 (Colo. 1999).  The total of all indemnity payments made on behalf of Bison Ridge was $352,500.  For ease of reference, a calendar year of January 1 to January 1 is used as the policies have different inception dates thought the years.  From the time Hall-Irwin completed its work until the last ZAIC policy goes out of force is a total of six policy periods are triggered (from January 1, 2003 to December 31, 2008).  Therefore there the indemnity allocated to each year is $58,750.

### a. <u>January 1, 2003 to January 1, 2005</u>

The AZIC policies specifically provide that they are primary coverage over other insurance unless the other insurance states it is also primary (**Exhibit 5**, p. Z 000332 ¶ 4(a); **Exhibit 6**, p. Z000584).  The at-issue American Family policies state they are excess over any policy Bison Ridge is insured under pursuant to an additional insured

endorsement (***Exhibit 1***, CGL Coverage Form, p. 7 at ¶ 4(b)(2); ***Exhibit 2***, CGL Coverage Form p. 8-9, ¶ 4(b)(2)).  As shown above, Bison Ridge is covered as an additional insured under the endorsements in the relevant AZIC policies (***Exhibit 5*** at Z 000341-342: ***Exhibit 6*** at p. Z 000463-464).  Therefore American Family's policies are excess.  Because they excess, it had no duty to defend under its policies.  The policies state:  When this insurance is excess we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend against that "suit" (***Exhibit 1***, CGL Coverage Form, p. 7 at ¶ 4(b)(2); ***Exhibit 2***, CGL Coverage Form p. 8-9, ¶ 4(b)(2)).  Accordingly, AZIC must reimburse American Family and Bison Ridge the $117,500 of indemnity payments allocated to these policy periods.  Further, because American Family did not owe a duty to defend in any policy period, it must be reimbursed in full for all of the defense costs and fees it incurred.

### b. January 1, 2005 to January 1, 2006

American Family's last policy goes out of force on April 15, 2006 but is included for analysis for the 2005 calendar year (***Exhibit 3***).  The at-issue ZAIC policy provides for primary, non-contributing completed operations coverage (***Exhibit 7*** at p. Z000568).  The at-issue American Family policy states it is excess over any policy Bison Ridge is insured under pursuant to an additional insured endorsement (***Exhibit 3***, CGL Coverage Form, p. 8 at ¶ 4(b)(2)).  As shown above, Bison Ridge is covered as an additional insured under the endorsements in the relevant ZAIC policy (***Exhibit 7*** at p. Z000568).  Therefore, American Family's policy is excess.  Because it is excess, it had no duty to defend under its policy.  The policy states:  When this insurance is excess we will have no duty to defend the insured against any "suit" if any other insurer has a duty

to defend against that "suit" (**Exhibit 3**, CGL Coverage Form, p. 8 at ¶ 4(b)(2)). Accordingly, ZAIC must reimburse American Family and Bison Ridge the $58,750 of indemnity payments allocated to this policy period.  Further, because American Family did not owe a duty to defend in any policy period, it must be reimbursed in full for all of the defense costs and fees it incurred.

### c.  January 1, 2006 to December 31, 2008

American Family does not have any policies for these periods.  Only ZAIC has coverage for these three years under the polices marked as **Exhibits 8**, **9**, and **10**. Because it does not have coverage under these three years, American Family's policies cannot owe a share of the indemnity allocated to these years.  Accordingly, ZAIC must reimburse American Family for the $176,250 in indemnity payments incurred.

Lastly, because Defendants' policies were primary for every year and therefore American Family did not owe a defense in any year, Defendants must reimburse American Family for the full amount of the defense fees and costs it paid.  In addition, Defendants must reimburse Bison Ridge, for the defense fees and costs it incurred in defending the McWilliams action.

### V.    CONCLUSION

Defendants owed a duty to defend Bison Ridge in all four lawsuits and breached that duty.   In fact, after all of the cases were settled and this lawsuit was filed, Defendants admitted as much in writing.   Because American Family's policies were excess and the losses allocated to any one year never exceeded Defendants' $1,000,000 policy limits for each year, the American Family had no obligation to defend

or indemnify any of the suits as all of the American Family policies' were excess to Defendants.

As a result, Defendants owe American Family $414,073 in defense fees and costs incurred in defending the Stickler, Lauro and McWilliams suits.  The Defendants owe Bison Ridge $10,844 in fees and cost it incurred in defending the McWilliams suit. As to indemnity, the Defendants owe American Family the $312,500 it paid in indemnity and owe Bison Ridge the $40,000 it paid in indemnity.

WHEREFORE, Plaintiffs American Family and Bison Ridge, LLC as for judgment in their favor that Defendants owed a duty to defend and indemnify.  **Plaintiffs seek judgment against AZIC in the amount of $329,958.50 as follows:**

Total Indemnity: $58,750 x 2 policy periods = $117,500.00

Total Defense: $424,917 x 50% (defense shared with ZAIC) = $212,458.50

**Plaintiffs seek judgment against ZAIC in the amount of $447,458.50 as follows:**

Total Indemnity: $58,750 x 4 policy periods = $235,000.00

Total Defense: $424,917 x 50% (defense shared with AZIC) = $212,458.50

and for pre-judgment interest, costs and any such further relief available under law or as deemed proper by the Court.

Respectfully submitted,

*s/William B. Stanton*
Jon F. Sands, #10680
William B. Stanton, #19990
Sweetbaum Sands Anderson PC
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Phone:  (303) 296-3377
Fax:  (303) 296-7343
jsands@sweetbaumsands.com
wstanton@sweetbaumsands.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

jyoung@mdmc-lawco.com
tjaworsky@mdmc-lawco.com

*s/William B. Stanton*
Jon F. Sands, #10680
William B. Stanton, #19990
Sweetbaum Sands Anderson PC
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Phone:  (303) 296-3377
Fax:  (303) 296-7343
jsands@sweetbaumsands.com
wstanton@sweetbaumsands.com